*792 EDMONDSON, Chief Judge:
This case involves an excessive-force claim and arises from an encounter between a sheriffs deputy and a motorist who refused to submit to lawful arrest during a traffic stop. Deputy Jonathan Rackard seeks interlocutory review of the district court’s decision denying him qualified immunity for the repeated use of a taser in effecting the arrest of Jesse Buckley (“Plaintiff’). Because Deputy Rack-ard’s use of force was not unconstitutionally excessive and, in any event, because the preexisting law at the time did not clearly establish that this use of force was excessive, we reverse the district court’s decision and remand the case for dismissal of the federal claims against Deputy Rack-ard.
I. Background[1]
Rackard, a deputy sheriff in Washington County, Florida, stopped Plaintiff for speeding in March 2004. The traffic stop occurred at night on the side of a two-lane highway that had no street lights. It was dark.
Financially destitute and homeless, Plaintiff became agitated about getting a ticket. Plaintiff began to sob. Despite Deputy Rackard’s repeated requests, Plaintiff refused to sign the traffic citation: signing is required by law. See Fla. Stat. § 318.14(2)-(3). Deputy Rackard warned Plaintiff twice that, if he did not sign the citation, he would be arrested. After the second warning, Plaintiff said “arrest me.” Without resisting, Plaintiff allowed himself to be handcuffed; he was then still sitting in his vehicle.[2] Now handcuffed, Plaintiff got out of his car.
As the deputy started to walk with Plaintiff to the patrol car, Plaintiff — a 23-year-old young man who weighed 180 pounds and was 6 feet, 2 inches tall— dropped to the ground behind his car, crossed his legs, and continued to sob. Deputy Rackard cautioned Plaintiff about the danger of getting hit by traffic on the nearby road. Plaintiff responded, “My life would be better if I was dead.”[3]
Deputy Rackard asked Plaintiff several times to stand up. Plaintiff did not do so. The deputy then attempted to lift Plaintiff to his feet; but Plaintiff remained limp and did not stand. After repeatedly and plainly warning Plaintiff that a taser device would be used (to which Plaintiff shouted, “I don’t care anymore — tase me”) and after giving Plaintiff some time to comply, the deputy discharged the taser. The taser *793 was used for approximately five seconds in the “stun gun” mode. The deputy applied the taser’s electrodes directly to Plaintiffs clothed back and chest. After Deputy Rackard discharged the taser, he asked Plaintiff again to stand up; but Plaintiff did not comply. Again, the deputy plainly warned Plaintiff that the taser would be used. Plaintiff still did not stand. After some time, Deputy Rackard discharged the taser for another five-second burst. The taser delivers an electrical shock; it hurts.
At this point, Deputy Rackard walked to his patrol car and, by radio, called for backup. Plaintiff remained on the ground. When the deputy returned, he ordered Plaintiff to get up. Again, Deputy Rack-ard plainly warned Plaintiff that the taser would be used and allowed Plaintiff time to comply. The deputy then attempted a second time to lift Plaintiff to his feet, but to no avail. Plaintiff still did not stand; and the deputy used the taser a third time. Even though Plaintiff continued to resist moving to the patrol car, Deputy Rackard made no more use of the taser.
Once another police officer arrived, Plaintiff promptly relented; and with the assistance of the other officer, Deputy Rackard escorted Plaintiff to the patrol car without incident. Plaintiff suffered sixteen small burn marks on his back from the taser with some scarring (the record does not say whether or not the scars are permanent) and keloid growth around some of the burns.[4] Plaintiff also claims that he suffered emotional injury from the incident: He says that he now finds it difficult to trust police officers and to ask for their assistance.
Plaintiff brought this section 1983 suit against Deputy Rackard in his individual capacity, alleging that the deputy used excessive force in violation of the Fourth Amendment.[5] Deputy Rackard moved for summary judgment on the basis of qualified immunity, which the district court denied.
II. Discussion

A. Excessive Force Claim

That the right to make an arrest “necessarily candes with it the right to use some degree of physical coercion or threat thereof to effect it” is well established. Graham v. Connor, 490 U.S. 386, 109 S.Ct. 1865,1871-72, 104 L.Ed.2d 443 (1989).
For excessive force claims, “objective reasonableness” is the test. Zivojinovich v. Barner, 525 F.3d 1059, 1072 (11th Cir. 2008). But we have noted some secondary factors to consider: “ ‘(1) the need for the application of force, (2) the relationship between the need and amount of force used, and (3) the extent of the injury inflicted.’” Draper v. Reynolds, 369 F.3d 1270, 1277-78 (11th Cir.2004) (quoting Lee v. Ferraro, 284 F.3d 1188, 1198 (11th Cir. 2002)). The nature and degree of force needed is measured by such factors as “the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.” Graham, 109 S.Ct. at 1872; see also Lee, 284 F.3d at 1198 (“[T]he force used by a police *794 officer in carryiíng out an arrest must be reasonably proportionate to the need for that force, which is measured by the severity of the crime, the danger to the officer, and the risk of flight.”).
The Supreme Court teaches that “[t]he test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application.” Graham, 109 S.Ct. at 1872 (internal quotation marks omitted) (alteration in original). Instead, we must “slosh our way through the factbound morass of ‘reasonableness.’ ” Scott v. Harris, 550 U.S. 372, 127 S.Ct. 1769, 1778, 167 L.Ed.2d 686 (2007); see also Graham, 109 S.Ct. at 1872 (“[P]roper application [of the reasonableness test] requires careful attention to the facts and circumstances of each particular case.... ”). As we have said before, courts must “look[ ] to the ‘totality of circumstances’ to determine whether the manner of arrest was reasonable.” Draper, 369 F.3d at 1277.
We do not sit in judgment to determine whether an officer made the best or a good or even a bad decision in the manner of carrying out an arrest. The Court’s task is only to determine whether an officer’s conduct falls within the outside borders of what is reasonable in the constitutional sense. We are to “balance the nature and quality of the intrusion on the individual’s Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion.” Scott, 127 5. Ct. at 1778 (internal quotation marks omitted). In the constitutional context, reasonableness — on a given set of facts — is “a pure question of law.” Id. at 1776 n. 8.
In the light of the undisputed facts established in the record, we conclude that Defendant’s use of force in this particular situation was not outside the range of reasonable conduct under the Fourth Amendment. Of particular importance are three facts. First, the incident occurred at night on the side of a highway with considerable passing traffic.[6] Second, the deputy could not complete the arrest — that is, truly control Plaintiff — because Plaintiff was resisting. Third, the deputy resorted to using the taser only after trying to persuade Plaintiff to cease resisting, after attempting to lift Plaintiff, and after repeatedly and plainly warning Plaintiff that a taser would be used and then giving Plaintiff some time to comply.
Although, as the district court observed, the underlying offense of refusing to sign a traffic citation was relatively minor, we nevertheless credit the government with a significant interest in enforcing the law on its own terms, rather than on terms set by the arrestee. The government has an interest in arrests being completed efficiently and without waste of limited resources: police time and energy that may be needed elsewhere at any moment. Even though Plaintiff was handcuffed, he still refused repeatedly to comply with the most minimal of police instructions — that is, to stand up and to walk to the patrol car. That Plaintiff was resisting arrest weighs in the deputy’s favor.[7] In addition, to the extent that the incident occurred beside an active *795 highway at night, we also credit the government’s interest in the safety of Deputy Rackard, Plaintiff, and even passing motorists: a legitimate interest to be advanced by putting Plaintiff in the patrol car. See Pennsylvania v. Minimus, 434 U.S. 106, 98 S.Ct. 330, 333, 54 L.Ed.2d 331 (1977) (acknowledging that the “hazard of accidental injury from passing traffic” may be “appreciable” in some situations). Deputy Rackard warned Plaintiff early on that they should not remain exposed alongside the highway for fear of being hit by a passing vehicle.
Against these important governmental interests weigh the natui’e and quality of the intrusion on Plaintiffs Fourth Amendment interests. Plaintiff alleges that he sustained, as a result of Deputy Rackard’s acts, emotional injury as well as sixteen small taser burns, which caused some scarring and keloid growth. Although Plaintiffs injuries are not insignificant, neither are they severe. Plaintiff points to no evidence in the record that the deputy’s use of the taser caused any second-order physical injuries;[8] nor has Plaintiff pointed to evidence that the burns he did sustain required medical attention. Accordingly, we regard the deputy’s use of the taser in this particular case as — at most— moderate, non-lethal force.[9] See Sanders v. City of Fresno, 551 F.Supp.2d 1149, 1168 (E.D.Cal.2008) (viewing “the use of a Taser as an intermediate or medium, though not insignificant, quantum of force”).
While conceding that a single use of the taser might arguably have been reasonable, the district court nevertheless concluded (and Plaintiff argues) that the other applications of the taser were grossly disproportionate and unnecessary, especially given that the arrest had been “fully secured” and given that backup was en route to assist in moving Plaintiff to the patrol car.
We disagree. Never was Plaintiff fully secured until after the second officer arrived. The district court’s suggestion that Plaintiff had been fully secured because he was handcuffed is mistaken: Plaintiff was not bound at the feet (so, he could both run and kick), he was moving around on the ground alongside a busy road, and he would not comply with the deputy’s repeated instructions to stand up and to move to the patrol car where Plaintiff could be confined. An objectively reasonable police officer could rightly believe that force was therefore necessary to secure the non-compliant Plaintiff in the patrol car and thereby complete the arrest.
We also reject the district court’s rationale that had Deputy Rackard “simply waited for back up, two officers could have lifted [Plaintiff] and carried him to the car without any application of force.” A single officer in the deputy’s situation confronting a non-compliant arrestee like Plaintiff need not — as a matter of federal constitutional law — wait idly for backup to arrive to complete an otherwise lawful arrest that the officer has started.
*796 The federal courts must not dictate through their interpretation of the Constitution how the police should allocate their limited resources. In most circumstances where an arrestee is resisting, a single officer can constitutionally effectuate an otherwise lawful arrest by resorting to the use of moderate, nonlethal force. No constitutional basis exists for requiring two or more officers to make routine arrests, even if deploying more officers might result in less force actually being used. See Menuel v. City of Atlanta, 25 F.3d 990, 996-97 (11th Cir.1994) (“ ‘The Fourth Amendment does not require officers to use the least intrusive or even less intrusive alternatives in search and seizure cases. The only test is whether what the police officers actually did was reasonable.’ ”) (quoting Plakas v. Drinski, 19 F.3d 1143, 1149 (7th Cir.1994)).
That an officer has requested more police assistance does not make the use of force before reinforcements arrive unreasonable. For instance, that the deputy called for backup after his second use of the taser does not render the third use unreasonable or excessive because the facts and circumstances that justified the first use still apply: that is, Plaintiff continued to resist arrest, the deputy and Plaintiffs safety while on the side of a highway at night was still at risk (not to mention the safety of other motorists), and the use of the taser itself was moderate, non-lethal force.
Needless to say, officers acting alone may not always use any and all force necessary to complete an arrest without assistance. If Deputy Rackard had used more severe techniques (beaten Plaintiffs head with a club or shot him, for example), this case would be a different case. Here, the record shows that Deputy Rackard only used moderate, non-lethal force; and he did so only after reasoning with Plaintiff, then after trying to lift Plaintiff, and finally after repeatedly warning Plaintiff — a warning given before each use of the ta-ser — that a taser would be used. In short, Deputy Rackard gave Plaintiff ample warning and opportunity to cease resisting before the deputy resorted gradually to more forceful measures. Even then, Plaintiffs injury was not great; and the deputy holstered his taser after using it briefly three times.
This case is not one where a compliant arrestee was abused for no good reason. Cf., e.g., Hadley v. Gutierrez, 526 F.3d 1324 (11th Cir.2008) (handcuffed, non-resisting arrestee in the custody of two officers is beaten). In the light of all the circumstances, therefore, we conclude that Deputy Rackard’s use of force was not unconstitutionally excessive.[10]

B. Qualified Immunity

Athough we conclude that the Constitution was not violated at all, we will also decide about immunity. Even if some of the deputy’s use of force was excessive under the Fourth Amendment, we conclude nevertheless that he is entitled to qualified immunity because he — given the circumstances he was facing — violated no already clearly established federal right.
In them individual capacities, government officials are entitled to immunity from suit “unless the law preexisting [their] supposedly wrongful act was al *797 ready established to such a high degree that every objectively reasonable official standing in [their] place would be on notice that what the defendant official was doing would be clearly unlawful given the circumstances.” Pace v. Capobianco, 283 F.3d 1275, 1282 (11th Cir.2002); see also Marsh v. Butler County, 268 F.3d 1014, 1031 (11th Cir.2001) (en banc) (stating that “fair and clear notice to government officials is the cornerstone of qualified immunity”).
We have pointed out before that “[government officials are not required to err on the side of caution.” Marsh, 268 F.3d at 1030 n. 8; see also Saucier v. Katz, 533 U.S. 194, 121 S.Ct. 2151, 2158, 150 L.Ed.2d 272 (2001) (“The concern of the immunity inquiry is to acknowledge that reasonable mistakes can be made as to the legal constraints on particular police conduct.... If the officer’s mistake as to what the law requires is reasonable, however, the officer is entitled to the immunity defense.”). As a consequence, qualified immunity does protect “all but the plainly incompetent or those who knowingly violate the law.” Malley v. Briggs, 475 U.S. 335, 106 S.Ct. 1092, 1096, 89 L.Ed.2d 271 (1986).
With these principles in mind, Plaintiff must demonstrate that, from the preexisting law, the deputy had “fair and clear notice” that the deputy’s conduct would break federal law. See Vinyard v. Wilson, 311 F.3d 1340, 1350 (11th Cir.2002); see also Saucier, 121 S.Ct. at 2156 (“The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted.”). To show that the law was clearly established in a case like this “where the applicable legal standard is a highly general one, such as ‘reasonableness,’ preexisting caselaw that has applied general law to specific circumstances will almost always be necessary to draw a line that is capable of giving fair and clear notice that an official’s conduct will violate federal law.” Thomas v. Roberts, 323 F.3d 950, 954 (11th Cir.2003). If an earlier case is “fairly distinguishable from the circumstances facing a government official,” then that case cannot “clearly establish the law for the circumstances facing that government official.” Vinyard, 311 F.3d at 1352; see generally Marsh, 268 F.3d at 1030-33.
Neither Plaintiff nor the district court has cited case-law establishing that Deputy Rackard’s use of the taser was clearly unlawful. Both rely on Lee, 284 F.3d at 1188, in which this Court denied qualified immunity to a defendant police officer on an excessive force claim. In Lee, the facts showed that the officer pulled over a young woman during the afternoon rush hour for a minor traffic violation, forced her out of her car, handcuffed her, and led her to the back of the car where the officer slammed her head against the car’s trunk and kept spreading her legs with his foot. Id. at 1191, 1198. Construing the facts in the light most favorable to the woman, the Lee panel stressed that she did not resist the officer at any time during the incident. Id.
The district court thought the present case was “analogous,”[11] concluding that— like the facts in Lee — the crime here was minor, Plaintiff posed no threat to the deputy or anyone else, and Plaintiff “never *798 actively resisted or attempted to evade arrest by flight.” The district court, as well as Plaintiff in his brief, placed considerable stress on the fact that Plaintiff had already been handcuffed, that Plaintiff resisted only passively, and that the deputy used the taser more than once.
We regard Lee as easily distinguishable from the facts and circumstances of this case. At best, Lee decides only that no officer can use force against an arrestee who is already handcuffed and who is resisting arrest in no way.[12] But unlike Lee, where the court stressed that the arrestee did not resist at any time during the arrest, here Plaintiff did resist: for example, he physically dropped to the ground, repeatedly refused to comply with the deputy’s reasonable orders (even after being warned that a taser would be used), and made no effort to stand when the deputy attempted on two occasions physically to lift Plaintiff to his feet. The use of force in Lee was wholly uncalled for; Lee decides nothing about the gamut of options for force usage in the circumstances of arres-tee intransigence. The circumstances that call on police to use some intermediate force — between no force and deadly force — remain the cases where the law of excessive force is most ambiguous. It will probably always be so, considering the limitless set of potential different fact combinations and the necessity of allowing for flexible responses from the police.
Lee does not control this case. More important for qualified immunity purposes, an objectively reasonable police officer could have believed that additional facts present here but not present in Lee — for instance, that Plaintiff was resisting arrest on a roadside at night and that the deputy plainly warned Plaintiff before using the taser — might “make a difference” about whether the conduct in the present case would violate federal law. See generally Marsh, 268 F.3d at 1032-33 (discussing when preexisting precedents cannot clearly establish the applicable law). Therefore, whatever fair and clear warning about unconstitutional force that Lee (or any other decisional law that has been drawn to our attention) gives does not reach the factual particularities of this case. Furthermore, the force used here did not approach being so excessive as obviously to violate the Fourth Amendment on its face. Cf, e.g., Priester v. City of Riviera Beach, 208 F.3d 919 (11th Cir. 2000) (denying qualified immunity — in the absence of controlling judicial precedent— where defendant police officers ordered dog to attack a compliant, non-resisting arrestee). At the very least, therefore, Deputy Rackard is entitled to qualified immunity.
III. Conclusion
Plaintiff resisted arrest. Given this circumstance in the context of all the other facts, Deputy Rackard’s gradual use of force, culminating with his repeated (but limited) use of a taser, to move Plaintiff to the patrol car was not unconstitutionally excessive. In addition, even if Plaintiff could establish that some of the deputy’s use of force violated the Fourth Amendment, the deputy still would be entitled to *799 qualified immunity because the applicable law at the time did not clearly establish that the deputy’s conduct — given the circumstances — was unconstitutional. Accordingly, the district court erred in denying Deputy Rackard’s motion for summary judgment.
REVERSED and REMANDED.

. The entire incident at issue was captured by a police video camera. We recount the facts as depicted in the videotape, which is part of the record. See Scott v. Harris, 550 U.S. 372, 127 S.Ct. 1769, 1776, 167 L.Ed.2d 686 (2007) (stating that the court of appeals "should have viewed the facts in the light depicted by the videotape”). The affidavits and other evidence in the record are consistent with the videotape. We take the record in Plaintiff's favor; so, when we write that Plaintiff says "X”, we have accepted "X" as a fact for this appeal.

. The issue before us is whether excessive force was used. Plaintiff does not dispute that he refused to sign the traffic citation. For background, see Fla. Stat. § 318.14(2)-(3); Robinson v. City of Miami, 867 So.2d 431, 432 (Fla.Dist.Ct.App.2004) (concluding that a refusal to sign a citation establishes probable cause to arrest). By the way, Plaintiff pleaded no contest to one count of refusal to sign a speeding ticket and to one count of resisting arrest without violence; Plaintiff “does not quarrel with his lawful conviction."
Compare Reese v. Herbert, 527 F.3d 1253, 1273 (11th Cir.2008) (concluding that excessive force was used in the context of an arrest without even arguable probable cause to arrest).

. The audio on this sentence is not completely clear. The word "my” might be something else. But we think that it is "my.”

. The taser was used three times. The taser might have touched Plaintiff more than once each time, however, because Plaintiff would move when the taser was applied. The taser has two prongs; so, Plaintiff says he came into contact with the taser at least eight times.

. Plaintiff also sued Bobby Haddock as the Sheriff of Washington County; the district court's decision granting summary judgment to the Sheriff on all claims against him in his official capacity is not before us, however.

. By our count, some 14 vehicles passed nearby the site of the traffic stop during the approximately 8 minutes that the deputy and the Plaintiff were both exposed on the roadside, that is not inside a car.

. That Plaintiff did not attack or menace the deputy does not shield Plaintiff from the use of force, even if it might result in pain. See Forrester v. City of San Diego, 25 F.3d 804, 807-08 (9th Cir.1994) (concluding that there 'was no violation of the Fourth Amendment where officers used pain compliance techniques-which caused injuries including bruises, a pinched nerve, and one broken wrist — to move demonstrators who were passively resisting arrest).

. For instance, Plaintiff did not suffer a broken bone or any other physical injury due to contact with the ground caused by the taser shock.

. The record does not reveal much about the particular characteristics of the taser used by Deputy Rackard. What little it does reveal shows that the Washington County Sheriff’s Department considered tasers to be non-lethal control devices. In addition, other courts have described tasers as non-lethal devices used to control persons resisting arrest. See, e.g., Plakas v. Drinski, 19 F.3d 1143, 1150 n. 6 (7th Cir.1994). Plaintiff points to no evidence in the record showing that tasers are lethal or that they pose a substantial risk of causing serious bodily injury.

. We must always recall that police officers are making hard decisions under difficult circumstances and within severe time constraints. Such decisions are easy to criticize later. The law makes allowances for the police officer as the person on the spot. "The ‘reasonableness’ of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.” Graham, 109 S.Ct. at 1872.

. In the qualified immunity context, "[public officials are not obligated to be creative or imaginative in drawing analogies from previously decided cases.” Hudson v. Hall, 231 F.3d 1289, 1297 (11th Cir.2000). In the light of preexisting law, "the unlawfulness must be apparent.” Anderson v. Creighton, 483 U.S. 635, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987).

. In addition to Lee, other cases then in existence similarly established that an officer may not use force against an arrestee who was handcuffed and who was not resisting arrest. See, e.g., Vinyard, 311 F.3d at 1348-49 (holding that the officer used excessive force by discharging pepper spray into the eyes of an arrestee who was handcuffed, secured in the back of the patrol car, and posed no threat to the officer); Slicker v. Jackson, 215 F.3d 1225, 1233 (11th Cir.2000) (holding that officers used excessive force by repeatedly beating arrestee, "even though he was handcuffed and did not resist, attempt to flee, or struggle with the officers in any way").