[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 16-15542
Non-Argument Calendar
_____

D.C. Docket No. 6:15-cv-00533-RBD-TBS

JUNE SCOTT,

Plaintiff-Appellee,

versus

OSSIE BATTLE,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Middle District of Florida
_____

(May 11, 2017)

Before JORDAN, ROSENBAUM and JILL PRYOR, Circuit Judges.

PER CURIAM:

Officer Ossie Battle of the Orlando Police Department arrested June Scott and, while Scott was in handcuffs, "took her down" to the ground with enough force that it caused Scott to suffer injury requiring surgery.  Scott brought a claim under 42 U.S.C. § 1983 against Battle for excessive use of force.  Battle appeals the district court's denial of his motion for summary judgment on the basis of qualified immunity.  Viewing the facts in the light most favorable to Scott, we hold that the circumstances of Battle's "takedown" violated Scott's clearly established constitutional rights; thus, we affirm.

## I.    FACTUAL BACKGROUND

The facts elicited during discovery are as follows.[1]  On May 25, 2014, Orlando police officers arrived at Scott's apartment complex in response to a 911 call from her husband following a domestic dispute.  Dispatch had informed the officers that Scott pulled a knife on her husband and subsequently threw the knife over a fence and ran away from the apartment. The first officer to arrive on the scene, Officer Michael Fiorentino-Tyburski, saw what he described as a "small

---

[1] On review of a motion for summary judgment, we view the facts in the light most favorable to the plaintiff. *Lee v. Ferraro*, 284 F.3d 1188, 1190 (11th Cir. 2002).  In recounting the facts, we will note where facts are disputed and at this stage resolve the disputes in Scott's favor.  We emphasize, however, "that the facts, as accepted at the summary judgment stage of the proceedings, may not be the actual facts of the case." *Priester v. City of Riviera Beach*, 208 F.3d 919, 925 n.3 (11th Cir. 2000) (internal quotation marks omitted).

woman" who fit the suspect's profile leaving the complex on foot. Doc. 37-1 at 19.[2] Fiorentino-Tyburski ordered Scott to stop, and she did.

Verbally protesting, yet complying with his command, Scott headed back into the apartment complex toward the officer. Around this time, the 26 year old Battle arrived, and he easily handcuffed the much smaller 56 year old Scott behind her back. Scott recalled that there were at least three officers present when she was handcuffed and that they may have had their guns drawn.[3] It is unclear whether Fiorentino-Tyburski was present when Scott was handcuffed and subsequently detained; he testified that upon seeing that Battle "had the situation under control," he departed to interview the 911 caller. *Id.* at 22-23. There is no evidence in the record suggesting any officers were concerned for their safety or the safety of the public while Scott was being handcuffed and secured or afterward. Further, although Scott's purse was searched, there is no evidence that she was frisked during this time.

The parties agree Battle had probable cause to arrest Scott. It is what happened after Battle placed handcuffs on Scott that is at issue in this appeal. Scott testified that throughout her interactions with Battle, she responded to and obeyed his commands and never tried to escape his custody or her handcuffs.

---

[2] "Doc. __" refers to the numbered entry on the district court's docket in this case.

[3] The dispatch report shows that six officers responded to the 911 call. Battle's testimony was unclear as to how many officers were present at the time of arrest.

But, at some point while the 5'4", 110-pound Scott was in handcuffs, in the presence of multiple officers, the 6'1", 250-pound Battle—who testified that he could bench press 320 pounds—took her to the ground.  The reason for the takedown is disputed.  But viewing the facts in the light most favorable to Scott, Battle "jerked [her] arm" so "aggressive[ly]" that it caused her pain, and she responded by "jerk[ing] back."  Doc. 38 at 29, 56.  This physical response to the pain Scott experienced immediately preceded Battle's swift takedown, in which he picked Scott up and "slammed" her on the pavement.  *Id.* at 30.[4]

Upon impact, Scott felt pain in her left leg from the fracturing of her tibial plateau, the knee-facing end of her shin bone.  She was wheelchair-bound throughout her five day stay in jail and received leg surgery the day after she was released.  Scott had to use crutches for six months following the incident.

Scott filed suit against Battle, Fiorentino-Tyburski, and the City of Orlando pursuant to 42 U.S.C. § 1983.  The district court dismissed without prejudice the claims against Fiorentino-Tyburski and the City, and neither is a party to this appeal.  Battle and Scott then filed competing motions for summary judgment and the district court denied both.  This is Battle's appeal.

## II.    ANALYSIS

---

[4] Battle has a different view of the incident.  He characterized Scott's actions while handcuffed as verbally abusive and testified that she was consistently pulling away from him.  He further testified that when he asked Scott to sit down, she refused, so he "placed her on the ground."  Doc. 37-7 at 30.  At this stage, however, we must credit Scott's version of the events.

The issue before us is whether Battle is entitled to qualified immunity from Scott's claim that he violated her Fourth Amendment rights by using excessive force during her arrest.  We review the district court's denial of summary judgment *de novo*, viewing the facts in the light most favorable to the nonmovant, here, Scott.  *Hadley v. Gutierrez*, 526 F.3d 1324, 1328 (11th Cir. 2008).

A government official asserting a qualified immunity defense bears the initial burden of showing "he was acting within his discretionary authority."  *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002).  It is undisputed that Battle was acting within his discretionary authority while arresting Scott.  Thus, the burden shifts to Scott to show that, taking the facts in the light most favorable to her, (1) Battle violated her constitutional right, and (2) this right was clearly established at the time of the alleged violation.  *Hadley*, 526 F.3d at 1329.

For the reasons set forth below, we agree with the district court that Battle's act of slamming Scott to the ground when she was already handcuffed, even in response to Scott's jerking her arm in reaction to a painful wrenching by Battle, violated her clearly established constitutional rights.

## A.   Constitutional Violation

5

To determine whether Battle violated Scott's Fourth Amendment right to be free from the use of excessive force during the course of an arrest,[5] we must ask "whether the officer's conduct is objectively reasonable in light of the facts confronting the officer." *Vinyard v. Wilson*, 311 F.3d 1340, 1347 (11th Cir. 2002). "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham v. Connor*, 490 U.S. 386, 396 (1989). This fact-specific analysis balances "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Id.* (internal quotation marks omitted)

We apply several factors in conducting this inquiry, including "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether [s]he is actively resisting arrest or attempting to evade arrest by flight." *Id.* We also consider "the extent of the injury inflicted" and whether the use of force was proportionate to its need at the time. *Hadley*, 526 F.3d at 1329. "Our decisions demonstrate that the point at which a suspect is handcuffed and poses no risk of danger to the officer is often the pivotal point for excessive force claims." *Mobley v. Palm Beach Cty. Sheriff Dep't*, 783 F.3d 1347, 1356 (11th Cir. 2015) (alteration and internal quotation marks omitted).

---

[5] *See* U.S. Const. amend. IV ("The right of the people to be secure in their persons . . . against unreasonable searches and seizures, shall not be violated . . . .").

Scott has raised a genuine issue of material fact, sufficient to avoid summary judgment, on whether the force Battle applied was excessive. At the time she was slammed to the ground with enough force that it broke her shin bone, Scott was in handcuffs and secured. Although she was a suspect in an aggravated assault, there is no evidence in the record that she posed any threat to the much larger Battle or the other officers or that she was attempting to flee. To the contrary, after dispatch informed the officers that Scott had discarded her weapon, Scott walked back to the apartment complex in compliance with Fiorentino-Tyburski's command, was placed in handcuffs uneventfully, and was being held in the presence of several officers. Under these circumstances, Scott's verbal protestations (which, she testified, included no threats or suggestions that she might flee or attempt to harm the officers) and her pained reaction, the "jerking" of her handcuffed arm, did not warrant such a disproportionate use of force.[6]

Battle argues that Scott's jerking motion was "active resistance" tipping the excessive force analysis in his favor. We disagree for two related reasons. First, Battle's justification fails to take the facts in the light most favorable to Scott. Scott testified that she obeyed Battle's commands and offered no resistance to

---

[6] We note that our review "must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396-97. Yet we find no evidence that Battle's takedown of Scott was reasonably necessary under the circumstances. To the contrary, the evidence suggests that Battle's use of force was not a split-second judgment but an act of frustration with what he perceived as Scott's intransigence. *See* Doc. 37-7 at 30.

being handcuffed.  When asked about her arm movement, she testified that it was merely a response to the pain she felt from Battle's "aggressive" positioning of her shoulder after she was handcuffed.  *Cf. Priester v. City of Riviera Beach*, 208 F.3d 919, 927 (11th Cir. 2000) (declining to characterize as resistance plaintiff's defensive kick to an attacking police dog);  *Slicker v. Jackson*, 215 F.3d 1225, 1227, 1233 (11th Cir. 2000) (declining to characterize handcuffed plaintiff as resisting when he slid off the hood of a police car to alleviate pain).  Therefore, the facts can fairly be read to suggest Scott offered no resistance.

Second, supposing the jerking of her arm could be categorized as "resistance," the circumstances of Scott's arrest nonetheless point to the disproportionality of Battle's takedown.  We have held that a "minor transgression" after an arrestee is subdued in handcuffs is not a blank check for the use of force; rather, in the event of such a minor transgression, our excessive force analysis depends on the totality of the circumstances confronting the officer. *Saunders v. Duke*, 766 F.3d 1262, 1269 (11th Cir. 2014) (citing *Lee*, 284 F.3d at 1197).  In *Saunders*, a case similar to Scott's, Saunders sold oxycodone pills to undercover agents, and when surrounded by three other law enforcement agents "immediately complied" with their commands by placing his hands on the car's windshield.  *Id.* at 1265.  An agent then pulled Saunders onto the hot pavement, handcuffed him, and left him lying flat on his stomach.  *Id.*  While prone, Saunders

8

informed the agents that the pavement was burning him and held his face off the ground in reaction to the heat.  *Id.*  Although he posed no threat to anyone, offered no resistance, and made no attempt to flee, one of the agents "slammed his head into the pavement with extreme force."  *Id.* at 1265-66, 1268 (internal quotation marks omitted).  We held the force applied to Saunders under these circumstances was "unnecessary, disproportionate, and constitutionally excessive."  *Id.* at 1268.  We further held that even if the facts as alleged could be understood to imply that Saunders "disobeyed an order by lifting his head off the hot pavement, that minor transgression does not mean that the force allegedly used was a constitutionally permissible response, or that the agents are entitled to qualified immunity."  *Id.* at 1269.

Under Scott's version of the facts, she was complying with the officers' orders when handcuffed, and after being handcuffed was under the control of the physically stronger Battle, no longer posing any potential danger, surrounded by police, not attempting to flee, and not actively resisting when Battle picked her up off the ground and slammed her onto the pavement, fracturing her shin bone.  At this stage, Scott has made a sufficient showing to create a genuine issue of material fact whether Battle used excessive force in violation of her constitutional rights.  We now turn to the second prong of our qualified immunity analysis, whether the violation was clearly established such that Battle had "fair warning" that the

9

takedown was unconstitutional.  *Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1277 (11th Cir. 2004).

## B.   Clearly Established Law

A constitutional right may be clearly established at the time of arrest when a "controlling and materially similar case declares the official's conduct unconstitutional." *Priester*, 208 F.3d at 926.[7]  We ask "whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier v. Katz*, 533 U.S. 194, 202 (2001).  Officers are not required to be "creative or imaginative in drawing analogies from previously decided cases." *Pace v. Capobianco*, 283 F.3d 1275, 1282 (11th Cir. 2002) (internal quotation marks omitted).  That is because although we do not require "a case directly on point for a right to be clearly established, existing precedent must have placed the statutory or constitutional question beyond debate." *White v. Pauly*, 137 S. Ct. 548, 551 (2017) (internal quotation marks omitted); *see Holloman*, 370 F.3d at 1277 ("A principle of constitutional law can be 'clearly established' even if there are 'notable factual distinctions between the precedents relied on and the cases then before the Court, so long as the prior decisions gave reasonable warning that

---

[7] We look to binding decisions of the Supreme Court of the United States, this Court, and the highest court of the relevant state (here, Florida).  *McClish v. Nugent*, 483 F.3d 1231, 1237 (11th Cir. 2007).

the conduct at issue violated constitutional rights.'" (quoting *United States v. Lanier*, 520 U.S. 259, 269 (1997))).

With these principles in mind, we conclude that it was clearly established on the date of Scott's arrest that the force Battle applied to a suspect like Scott—who was handcuffed and completely secured such that there was no risk of danger to the officers or flight—was unlawful. *See, e.g.*, *Priester*, 208 F.3d at 927 (11th Cir. 2000); *Slicker* 215 F.3d at 1233 (11th Cir. 2000); *Lee*, 284 F.3d at 1198 (11th Cir. 2002).

In *Priester*, two police officers with a police dog found Priester, a burglary suspect, hiding in a canal. 208 F.3d at 923. After Priester rose from his hiding place with his hands up, the officers ordered him to lie down on the ground. *Id.* When Priester asked why, an officer responded that if he refused, the dog would be released. *Id.* Priester complied, and the officer released the dog anyway. *Id.* When Priester kicked the attacking dog in self-defense, the officer threatened him with a gun and let the attack continue. *Id.* at 923-24. In affirming the denial of the officer's motion for judgment as a matter of law based on qualified immunity, we held that a compliant suspect who "did not pose a threat of bodily harm to the officers or to anyone else . . . . [and] was not attempting to flee or resist arrest" clearly did not warrant the force unleashed. *Id.* at 927.

11

In *Slicker*, the plaintiff was leaving a police station when he was arrested for disorderly conduct. 215 F.3d at 1227. While Slicker was handcuffed, officers "slammed his head against the pavement and knocked him unconscious." *Id.* According to Slicker, he was placed on the hood of a police car and testified that he "couldn't feel [his] arms. So [he] slid off to the side of the car so it would relax the back of [his] neck." *Id.* From his new position on the ground he was kicked and beaten further. *Id.* We affirmed the district court's denial of qualified immunity on the officers' motion for judgment as a matter of law because a jury could find the officers' use of force was excessive, reasoning that Slicker was "handcuffed and did not resist, attempt to flee, or struggle with the officers in any way." *Id.* at 1233.

In *Lee*, a female driver, Lee, who was physically smaller than her arresting officer, was pulled over for the minor offense of improperly honking her horn. 284 F.3d at 1190-91. The officer pulled Lee from the driver's seat and then handcuffed her, frisked her, and slammed her against the trunk of her car. *Id.* at 1191. Although the officer disputed it, Lee testified that she did not resist. *Id.* We affirmed the district court's denial of the officer's motion for summary judgment based on qualified immunity, holding that even though the officer had the power to effect a custodial arrest on Lee, it was unreasonable to use such force "*after* she was arrested, handcuffed, and completely secured, and after any danger to the

12

arresting officer as well as any risk of flight had passed." *Id.* at 1199 (emphasis in original).

In light of these cases, no objectively reasonable officer in Battle's position could have thought that slamming a physically outmatched, handcuffed, secured suspect— who was surrounded by multiple officers, not resisting arrest, and making no attempt to flee—was a constitutionally permissible use of force.

Nevertheless, under this prong Battle again raises the fact that Scott undisputedly jerked her arm as the distinguishing fact separating Scott's circumstances from the cases above.[8]  We find his argument unavailing for the same reasons we discussed in Part II.A.  At the summary judgment stage, viewing the record in the light most favorable to Scott, we cannot characterize Scott's pained reaction as "resistance."  And, even if we did, such a minor transgression would not change our conclusion here.  *See Saunders*, 766 F.3d at 1269 (holding

---

[8] Battle cites two unpublished cases in support of his related argument that this Court has sanctioned greater use of force for lesser resistance.  Setting aside that the summary judgment standard does not permit us to characterize Scott's jerk as resistance in the face of evidence to the contrary, the circumstances in both cases are distinguishable from the case at hand.  In *Buckley v. Haddock*, a split panel reversed the district court's denial of summary judgment based on qualified immunity to an officer without police backup who, after repeatedly asking a noncompliant, handcuffed suspect—a "23-year-old young man who weighed 180 pounds and was 6 feet 2 inches tall"—to stand up and repeatedly and plainly warning him that the officer would use a taser if he did not comply, tased the suspect.  292 F. App'x 791, 792-93 (11th Cir. 2008) (unpublished).  Similarly, in *Alday v. Groover*, a drunk driving suspect who was handcuffed and secured in the back of patrol car refused to exit the car at the jail after repeated warnings.  The officer turned down the taser's strength before using it to get "compliance" with his order.  601 F. App'x 775, 776-77 (11th Cir. 2015) (unpublished).  Unlike here, both cases involved uncooperative suspects whom lone officers repeatedly warned prior to the use of force.

the law clearly established that an officer cannot use "extreme force" in response to a handcuffed, secured arrestee's "minor transgression").

Our precedent in *Priester*, *Slicker*, and *Lee* gave Battle reasonable warning that slamming—with bone-breaking force—a suspect in Scott's circumstances was unconstitutional.  *See Saunders*, 766 F.3d at 1269.[9]  Thus, we agree with the district court that qualified immunity is inappropriate at this stage of the proceedings.

### III.    CONCLUSION

For the reasons explained above, we affirm the district court's denial of summary judgment based on qualified immunity.

**AFFIRMED.**

---

[9] Although *Saunders* was published 15 weeks after Scott's arrest, it held that the agents who slammed the handcuffed Saunders into the pavement violated clearly established rights during his arrest in 2008, six years before Scott's arrest.  766 F.3d at 1265 (11th Cir. Sept. 8, 2014).