60 F.3d 1230
 Evangelina MARAVILLA, individually and as Administratrix of
the Estate of Melecio Maravilla, Adriana Marisela,
Melecio Maravilla, Jr., et al.,
Plaintiffs-Appellants,
v.
UNITED STATES of America, John Malone, Kevin Cronin, et al.,
Defendants-Appellees.
 No. 94-3968.
 United States Court of Appeals,
Seventh Circuit.
 Argued May 9, 1995.
Decided July 19, 1995.
 
 Ivan E. Bodensteiner (argued), Valparaiso, IN, for Evangelina Maravilla, Adriana Marisela, Jesus Maravilla, and Melecio Maravilla, Jr.
 Orest S. Szewciw, Asst. U.S. Atty., Dyer, IN, Barbara L. Herwig, Dept. of Justice, Civ. Div., Appellate Section, Washington, DC, Douglas B. Jordan (argued), Federal Reserve System, Matthew T. Fricker, Dept. of Justice, Civ. Div., Washington, DC, for U.S., John Malone, Kevin Cronin, Tim Wilson, and Richard W. Marianos.
 Anthony DeBonis, Jr., Terrance L. Smith, Krista Smith MacLennan (argued), Smith & Debonis, East Chicago, IN, for City of East Chicago, Michael Muskin, Feliciano Rodriguez, John Nava, and Ralph Flores.
 Before ESCHBACH, FLAUM, and MANION, Circuit Judges.
 MANION, Circuit Judge.
 
 
 1
 In the early morning hours agents of the Bureau of Alcohol, Tobacco and Firearms (BATF), working in conjunction with members of the East Chicago, Indiana police force, executed a warrant on the home of Jesus Maravilla for the purpose of arresting him for violations of state firearms law. During the course of the forceful entry and search, four BATF agents shot and killed Jesus' father, Melecio Maravilla, Sr. The victim's wife, Evangelina Maravilla, sued the United States, the four BATF agents, the City of East Chicago and four of its officers under the Federal Tort Claims Act (FTCA), 42 U.S.C. Sec. 1983, and state law, claiming that the defendants acted unreasonably by killing her husband. The district court granted summary judgment for the defendants on all of plaintiff's claims, and plaintiff appeals. We affirm the district court.
 
 I.
 
 2
 Officers of the East Chicago Police Department (ECPD), in conjunction with the BATF, were investigating firearms offenses involving criminal gangs in Hammond and East Chicago, Indiana. As a result of these investigations ECPD officers obtained a state warrant for the arrest of Jesus Maravilla for selling a sawed-off shotgun. Although the plan was simply to arrest Jesus at his home, the situation was complicated because Jesus also resided with his father, Melecio Maravilla, Sr. The ECPD had received a report from one of Melecio's neighbors indicating that Melecio had made threats of violence against the ECPD. On another occasion Melecio informed an ECPD officer that he was tired of he and his family being harassed by the ECPD, and that if the ECPD took action against them "he had more firepower than they did." The ECPD passed this information along to the BATF.
 
 
 3
 Based on this information, and that as the holder of a valid state handgun permit Melecio might very well be armed and able to carry out his threats, the BATF determined that it would use what is called an entry control team ("ECT")--a SWAT team--in executing the arrest warrant at the Maravilla residence. The ECT would be broken down into three "bunker teams," consisting of three to four BATF agents each. Two of the bunker teams were to secure the first floor of the Maravilla residence; the other team was to secure the second floor. In addition, the ECT plan consisted of BATF agents and ECPD officers who would cover the perimeter of the Maravilla residence to make sure no one escaped while the bunker teams executed the raid.
 
 
 4
 The raid took place at six in the morning. The ECT officers knocked on the door announcing "police with a warrant." After receiving no response, the officers broke down the door and proceeded into the home, the two bunker teams securing the first floor and the second bunker team securing the second floor. As the teams proceeded through the house they continued to yell "police." At the same time, non-ECT BATF and ECPD officers took up their positions around the perimeter of the Maravilla residence.
 
 
 5
 As the second floor bunker team was proceeding through that section of the house they heard gunshots coming from a bedroom. Upon reaching the bedroom, ECT agents saw Jesus' father, Melecio, kneeling on a bed and firing a gun through a window. The agents told Melecio to drop the gun. Melecio did not, but continued firing out of the window. The agents shot Melecio several times. Melecio was taken to a hospital where he died.
 
 II.
 
 6
 Our review of the district court's grant of summary judgment is de novo. Our task is to view the evidence and reasonable inferences drawn from it in the light most favorable to the non-moving party and determine if there exists a genuine issue for trial. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249, 106 S.Ct. 2505, 2510-11, 91 L.Ed.2d 202 (1986).
 
 
 7
 Plaintiff insists that there are disputed issues of material fact which should have prohibited the district court from granting summary judgment on her claim that the defendants acted unreasonably[1] when they shot and killed her husband. She first points us to what she sees as conflicting statements of some of the officers as to why they shot her husband. Some officers testified that they shot Melecio to protect themselves, while other officers testified that they did so because they believed he was shooting at officers on the ground. From this conflict plaintiff asks us to conclude that there is a triable issue of fact on the officers' justification for the shooting.
 
 
 8
 This so-called conflict between the officers' stated justifications is beside the point. Under the Fourth Amendment the inquiry is whether the officer's decision to use deadly force was objectively reasonable. Graham v. Connor, 490 U.S. 386, 396-97, 109 S.Ct. 1865, 1872, 104 L.Ed.2d 443 (1989). Whether the decision was objectively reasonable is to be determined in light of the facts and circumstances confronting the officers at the moment they acted. Id. at 397, 109 S.Ct. at 1872. One factor which may support this determination is where the suspect poses an immediate threat of death or serious physical injury to the officer or others. Id. at 396, 109 S.Ct. at 1872; see also Plakas v. Drinski, 19 F.3d 1143, 1146 (7th Cir.), cert. denied, --- U.S. ----, 115 S.Ct. 81, 130 L.Ed.2d 34 (1994) (officer may use deadly force where he has probable cause to believe that the suspect "poses a significant threat of death or serious physical injury to the officer"). That certainly was the case here under either of the officers' stated justifications. A reasonable officer executing a warrant in a home confronted by a person firing a gun would have certainly believed that he was at risk of serious harm. And that same officer, knowing that other officers were outside the home, could have reasonably believed that an armed person firing a gun outside the home posed a risk of serious physical harm to the other officers who were outside the home. Moreover, these officers did not immediately shoot the victim but instead ordered him to drop the gun. He refused and continued firing. Only at that point did the officers fire. Under these circumstances, either one of the officers' stated reasons for shooting the victim would provide an objectively reasonable justification for the use of deadly force. In that case, any variance among the officers' stated justifications was immaterial and thus cannot provide a basis to upset the district court's grant of summary judgment. See Anderson, 477 U.S. at 248, 106 S.Ct. at 2510 (material facts are those which might affect the outcome of the suit under the governing law).
 
 
 9
 The plaintiff's second instance of a disputed material fact is simply a spinoff of her first. Plaintiff contends that the BATF officers who shot Melecio knew that according to the BATF's ECT plan there were not supposed to be any BATF or ECPD officers on the ground below the window out of which Melecio was shooting. She claims that this undermines those officers' earlier statements that they shot Melecio because they believed he was shooting at officers on the ground. But just what were these officers to believe? They knew other officers were outside guarding the exits of the house. At what (or whom) else then could Melecio have been shooting at six in the morning during a forcible entry and search by the authorities? We do not wish to downplay Melecio's demise. Nor, for that matter, do we understand why, to arrest a seventeen-year-old suspected of possessing an illegal shotgun in violation of state law, it required an early-morning raid by a dozen or so federal and "federalized" state officers on a home in which several other family members not suspected of any actual criminal wrongdoing were present (recall that Melecio held a valid state handgun permit and thus could not have been a felon in possession of a weapon). That decision, however, has not been challenged in this appeal. What is before us is whether the undisputed facts of the summary judgment record demonstrate that the officers acted reasonably. It is obvious that any reasonable officer faced with this same situation could only have assumed that one of his colleagues on the ground had moved into the area under the window from which Melecio was firing his weapon. Confronted with such a situation, coupled with Melecio's refusal to stop firing, an officer could reasonably conclude that deadly force was necessary to protect other officers and civilians from the real risk of serious bodily harm or death posed by Melecio. Therefore this second claimed factual dispute provides no grounds to upset the district court's judgment.
 
 
 10
 Having said this, we are mindful of the practical problems a plaintiff alleging deadly force may face in resisting summary judgment. As in the case before us the witness most likely to contradict the officers' testimony is dead. In these situations we think it wise to examine all the evidence to determine whether the officers' story is consistent with other known facts. See Scott v. Henrich, 39 F.3d 912, 915 (9th Cir.1994), cert. denied, --- U.S. ----, 115 S.Ct. 2612, 132 L.Ed.2d 855 (1995). Here several BATF and ECPD officers positioned on the ground testified that they saw and heard Melecio firing a gun out of the bedroom window. What's more, the summary judgment record also contains the report of a detective who stated that bullet holes were found in a house across from the Maravilla residence in the line of fire from the window out of which Melecio fired his gun. This additional evidence corroborates the defendant officers' story that Melecio was actually firing a weapon out of the bedroom window and posed a threat to others, and therefore convinces us that this case was properly resolved by summary judgment.[2]
 
 III.
 
 11
 Because there are no genuine disputes of material facts, the district court's grant of summary judgment is
 
 
 12
 AFFIRMED.
 
 
 
 [1]
 Although plaintiff is challenging the district court's judgment against her on her federal and state claims, she acknowledges that if the officers acted reasonably this resolves her entire case
 
 
 [2]
 Because plaintiff has failed to demonstrate a Fourth Amendment violation, we need not consider the district court's additional determination that the defendants were entitled to qualified immunity. Kraushaar v. Flanigan, 45 F.3d 1040, 1049 n. 4 (7th Cir.1995)