[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 14-14183

_____

D.C. Docket No. 3:11-cv-00061-DHB-BKE


LENA WILLIAMS,

Plaintiff-Appellee,


versus


JEFFERY DEAL,
individually and in his official capacity
as a Police Officer of the City of East Dublin,

Defendant-Appellant,


WILLIAM LUECKE,
individually and in his official capacity as
Chief of Police of the City of East Dublin, et al,

Defendants.

_____

Appeal from the United States District Court
for the Southern District of Georgia

_____

(October 26, 2016)

Before JORDAN and FAY, Circuit Judges, and WALKER,[*] District Judge.

PER CURIAM:

This unfortunate case concerns a police officer's use of force resulting in a death. While sitting in his patrol car, the police officer saw another car roll through a stop sign and then drive away. Several minutes later, the police officer caught up with the other car as it parked in a driveway. The police officer turned on his emergency lights as he pulled into the driveway behind the other car. When the driver got out of his car, the police officer ordered him to get back inside and then tried to force the driver back into the car. The driver resisted with force. During the ensuing struggle, the driver grabbed at the police officer's gun and punched the officer in the head. The police officer broke free, got several feet away, drew and aimed his gun at the driver. Notwithstanding the officer's show of force, the driver advanced towards the police officer while raising his arms. The police officer shot and killed the driver.  The police officer claims that he's entitled to qualified immunity from the plaintiff's federal-law claims.

The district court concluded that the police officer hadn't satisfied a preliminary requirement of qualified immunity—to be acting within the scope of his authority at the time of the incident—because state law requires that a police officer have certain annual training to use the power of arrest, and apparently this officer

---

[*] Honorable Mark E. Walker, United States District Judge for the Northern District of Florida, sitting by designation.

2

hadn't received that training during the previous year. The police officer discovered the problem, told his superiors, received the training during the next year, and was told that the proper authority considered the problem fixed and that he could now exercise the power of arrest. But apparently the problem wasn't actually fixed at the time of the incident because the police officer hadn't requested and received a waiver excusing his failure to complete training during the previous year.

We conclude that the police officer didn't violate the Fourth Amendment at all. Because of this conclusion, we needn't engage in a full-blown qualified immunity analysis (which would include determining whether the officer was acting within the scope of his discretionary authority and whether any rights at issue were clearly established). *See Woodruff v. Mason*, 542 F.3d 545, 559 n.17 (7th Cir. 2008); *Helms v. Zubaty*, 495 F.3d 252, 259 (6th Cir. 2007); *Santoni v. Potter*, 369 F.3d 594, 602 (1st Cir. 2004); *Myers v. Klevenhagen*, 97 F.3d 91, 96 (5th Cir. 1996).[1]

The police officer also argues that he's entitled to official immunity from the plaintiff's state-law claims because he performed discretionary acts without actual malice. Because plaintiff failed to respond to this argument, we find plaintiff waived any contrary arguments.

---

[1] We too have ruled—albeit in unpublished opinions—that an exhaustive qualified immunity analysis is unnecessary if there is no constitutional violation. *See Taylor v. Freeman*, 447 F. App'x 78, 81 (11th Cir. 2011); *Fowler v. Chattooga Cnty., Ga.*, 307 F. App'x 363, 366 n.3 (11th Cir. 2009); *Hilton v. Sec'y for the Dep't of Corrs.*, 170 F. App'x 600, 604 n.4 (11th Cir. 2005); *Mongeau v. Jacksonville Sheriff's Office*, 197 F. App'x 847, 852 (11th Cir. 2005).

We reverse the parts of the district court's order denying qualified and official immunity and remand for judgment to be entered in favor of the police officer.

I

We start with the procedural background of the case. The plaintiff Lena Williams is the mother of Melvin Williams and the administrator of his estate. The defendant is Officer Jeffery Deal of the City of East Dublin Police Department (EDPD). The plaintiff asserts that Officer Deal unlawfully arrested Mr. Williams and used excessive force in carrying out the arrest. The plaintiff brings claims against Officer Deal under 42 U.S.C. §1983 and the Fourth Amendment, along with various claims under state law. The district court granted summary judgment for Officer Deal on the unlawful-arrest claim and a state-law claim and entered judgment as to those claims. The district court also denied qualified immunity on the excessive-force claim and official immunity on the remaining state-law claims. Officer Deal appeals the denial of qualified immunity and official immunity.[2]

The denial of summary judgment based on qualified or official immunity is subject to full review without deference to the district court's legal conclusions. *See, e.g.*, *Gilmore v. Hodges*, 738 F.3d 266, 272 (11th Cir. 2013). A court views the evidence in the light most favorable to the nonmoving party. A court also draws

---

[2] The plaintiff also sued the City of East Dublin and the police chief. The district court granted summary judgment for the police chief and the city on all claims against those parties. The plaintiff didn't appeal the district court's adverse judgment.

reasonable inferences the same way.

## II

Officer Deal argues that he is entitled to qualified immunity because he was acting within the scope of his discretionary authority and because his actions did not violate clearly established law in the particular circumstances which he faced. *See Harbert Int'l, Inc. v. James*, 157 F.3d 1271, 1281 (11th Cir. 1998). If the defendant shows that he was acting within the scope of his discretionary authority, the plaintiff must show (a) a violation of a constitutional right; and (b) that the right was clearly established at the time of the defendant's alleged misconduct. *Saucier v. Katz*, 533 U.S. 194, 201 (2001). Courts have discretion to decide which of these "should be addressed first in light of the circumstances in the particular case at hand." *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

## A

A case involving a police officer's use of deadly force may present a special concern on summary judgment. "[T]he witness most likely to contradict [the police officer's] story—the person shot dead—is unable to testify." *O'Bert ex rel. Estate of O'Bert v. Vargo*, 331 F.3d 29, 37 (2d Cir. 2003) (quotation omitted). In such circumstances it is "wise to examine all the evidence to determine whether [the police officer's] story is consistent with other known facts." *Maravilla v. United States*, 60 F.3d 1230, 1233–34 (7th Cir. 1995). A reviewing court "undertake[s] a fairly

5

critical assessment of the forensic evidence, the officer's original reports or state-ments and the opinions of experts to decide whether the officer's testimony could reasonably be rejected at a trial." *Plakas v. Drinski*, 19 F.3d 1143, 1147 (7th Cir. 1994). But if the circumstantial evidence doesn't contradict a police officer's direct testimony, conjecture cannot create a genuine issue of material fact. *See Rodriguez v. Farrell*, 280 F.3d 1341, 1353 n.20 (11th Cir. 2002).

For the most part we agree with the district court's assessment of the undis-puted facts. Where we disagree, we explain why.

B

The morning of May 14, 2010, found Jeffery Deal on duty as a police officer for the City of East Dublin, Georgia. He was parked in a marked police car at the Amba Food Mart on Buckeye Road in East Dublin. From there, Officer Deal saw Melvin Williams run a stop sign a block to the south at the intersection of Boat Ramp Road and Buckeye Road.

As in many small towns, these two were not complete strangers. Officer Deal had, in his words, "[p]rior knowledge and prior dealings" concerning Mr. Williams and the EDPD. In their first meeting, a year and a half before the shoot-ing, Officer Deal responded to a report of a fight between Mr. Williams and a girl-friend. Officer Deal saw marks on Mr. Williams's girlfriend but did not see a fight. According to Officer Deal, Mr. Williams's girlfriend didn't want to press charges,

6

so Officer Deal did not arrest him. Mr. Williams's family told Officer Deal that Williams had recently completed a ten-year prison sentence.

Officer Deal had also pulled over Mr. Williams several times without any physical altercation. Officer Deal said that EDPD had "locked up" Mr. Williams's brother "not too long ago." Officer Deal thought that the brother had called Mr. Williams with a cell phone from the back of a police car to have Mr. Williams discard cocaine. Before the shooting, Officer Deal had seen Mr. Williams's criminal record and knew that he was a convicted felon. Officer Deal thought that Mr. Williams had been imprisoned for armed robbery or aggravated assault.

Officer Deal was told of other dealings between Mr. Williams and the EDPD.  Some days before the shooting, one Sergeant Tim Duvall told Officer Deal that Mr. Williams had pistol-whipped and beat up a girlfriend. Sergeant Duvall also told Officer Deal that Mr. Williams made threats towards Sergeant Duvall. Mr. Williams told a mutual friend that the next time Sergeant Duvall pulled over Mr. Williams or came to his house "it would be the last time," or words to that effect. Finally, Officer Deal said that "his chief" and another officer told him they were looking into Mr. Williams for trafficking stolen TVs and stolen guns.[3]

---

[3] In his deposition, the police chief said that he didn't have documentation of an investigation of Mr. Williams for trafficking in firearms or an arrest for the pistol-whipping incident. Citing the police chief's testimony, the district court said that "[w]ithout further corroboration of these incidents at this time, this particular claimed background knowledge was not considered in resolving the motion." "[W]e accept Defendant's factual assertions when they are based on undisputed evidence and have not been contradicted by Plaintiff." *E.g.*, *Singletary v. Vargas*, 804

Turning back to May 14, 2010, Officer Deal saw Mr. Williams drive over a white traffic line, look towards Officer Deal, and then slam on his brakes, sliding into the intersecting roadway. Mr. Williams's car then turned south on Buckeye Road and sped away. Officer Deal pursued, thinking that Mr. Williams was trying to elude him. But he didn't turn on his emergency lights and sirens or report his actions.

Mr. Williams drove one block south on Buckeye Road and then turned left onto Daley Street. When Officer Deal, following behind, reached Daley Street he saw Mr. Williams turning right onto Marion Street. Instead of following, Officer Deal continued south on Buckeye Road on a then-parallel but ultimately intersecting route. Both reached Roberson Lane simultaneously. Officer Deal continued south and turned right on Derriso Lane to gain a better view, as it is up on a hill.

The police car's video camera captured some of the incident. At 9:06:01 a.m., Officer Deal turned around, drove back towards Buckeye Road, and turned

---

F.3d 1174, 1176 n.2 (11th Cir. 2015). Because the police chief's testimony doesn't contradict Officer Deal's testimony, this information should be considered. The relevant fact isn't whether Mr. Williams assaulted his girlfriend.  It's whether Sergeant Duvall said that to Officer Deal. Likewise, Officer Deal said that the chief and another officer told him that they suspected Mr. Williams of stealing guns and other property. The police chief's testimony that he lacked documentation of an investigation doesn't contradict Officer Deal's testimony regarding what he was told about Mr. Williams at the time of the shooting.

north onto Buckeye Road. While turning north, he saw Mr. Williams turning into a driveway about 100 yards away.[4]



Officer Deal drove toward Mr. Williams and turned on his emergency lights as the cruiser pulled into the driveway behind Mr. Williams's car.[5] The map below illustrates the area and the routes of each car[6]:

---

[4] The route that Mr. Williams took from Marion Street to 415 Buckeye Road is unclear.

[5] When the emergency lights were activated, the police car's dashboard camera captured audio and visual images of the incident. As a result of its programming, the saved video portion begins thirty seconds before activation of the emergency lights.

[6] This Court takes judicial notice of the geography. *See, e.g.*, *United States v. Proch*, 637 F.3d 1262, 1266 n.1 (11th Cir. 2011). The illustration is included to better present the record evidence and give a frame of reference. Of course this does not establish position or view with specificity. The blue lines indicate Officer Deal's movements. The red lines indicate Mr. Williams's movements.

9



Before he was able to radio in the traffic stop, Officer Deal saw Mr. Williams remove his seatbelt, move around inside the car, and abruptly jump out of the car as though to flee. Officer Deal immediately exited the police car and ran towards Mr. Williams's car. As he moved towards Mr. Williams's car, Officer Deal's right hand was on his firearm holster.

10





At about this point, Officer Deal said loudly "Get in the car. Don't get out of the car on a traffic stop."

The initial contact between Officer Deal and Mr. Williams is off-camera. In the brief moment after the command, rather than obeying the command, Mr. Williams continued towards Officer Deal. Officer Deal grabbed Mr. Williams and tried to push him back into the car.[7]

At that point, Officer Deal and Mr. Williams got "tied up" and a vigorous off-camera fight ensued. They fought standing and wrestled on the ground, but eventually got back on their feet. During this fight, Mr. Williams hit Officer Deal in the head several times with a closed fist and Officer Deal responded with some knee strikes. Officer Deal tried to get out his pepper spray but was preoccupied blocking Mr. Williams. During the off-camera part of the fight, Mr. Williams says twice "What is wrong with you?" As the district court recounted, Mr. Williams "grabbed Deal's firearm holster and made several violent jerking motions. Deal struggled to hold on to the gun, and the holster unsnapped." ECF No. 190, at 9 (citation omitted).

---

[7] The district court noted that Officer Deal said on some occasions that Mr. Williams was the first to initiate physical contact. In his deposition, Officer Deal said "[w]hen Mr. Williams come out of the vehicle in an aggressive manner chest to chest with me, not knowing what he was fixing to do, I did attempt to place him back in the vehicle." Officer Deal elaborated: "I believe he come chest to chest with me and made contact with me first. Or we possibly could have done it simultaneously. If I had my hand out and he come into me, even though my hand was out, he would have made contact with me first by coming into me." In his affidavit, Officer Deal says Mr. Williams "immediately started fighting with me when I reached the car." Officer Deal also wrote a thorough two-page incident report. Following a Georgia Bureau of Investigation (GBI) request, the police chief told Officer Deal to shorten the statement. Someone else wrote half of the narrative of the existing incident report. The district court was correct to proceed under the version of facts most favorable to the plaintiff, as we do.

12

After about twenty seconds out of view, Officer Deal and Mr. Williams return to the view of the dash camera. The district court aptly described this point in the incident: "At that time, Deal was slightly hunched over with both hands on the holster-side of his body near his firearm, and Williams appeared to be pulling or grabbing at Deal around his upper torso."



Somehow, Officer Deal knocked Mr. Williams's hands off the firearm. Mr. Williams pulled back his right hand and punched Officer Deal on the back of his head or neck with his right hand.

13





14





15

After that punch, Officer Deal backed away, out of view of the police car's camera. Officer Deal drew his gun and pointed it at Mr. Williams.



After a momentary pause, Mr. Williams advanced towards Officer Deal while raising his hands.



16

From a distance of about six feet, Officer Deal fired one shot at Mr. Williams. The bullet hit Mr. Williams and caused his death. The time between the physical separation and the gunshot was about two seconds.

In addition to the gunshot wound, an autopsy revealed that Mr. Williams had minor scrapes and bruises on his fingers, wrist, legs, and cheek, consistent with minor blunt-force injuries sustained during the fight. After the fight, Officer Deal's uniform was dirty, torn on one pant leg, and a lapel pin had been partially ripped off. Officer Deal had scrapes and bruises on his left hand, wrist, and above his left eye.[8]

C

The plaintiff argues that there are three different ways how Officer Deal violated Mr. Williams's rights under the Fourth Amendment. First, the plaintiff asserts that the stop of Mr. Williams's car was unconstitutional and that violation was the proximate cause of his death. Second, the plaintiff asserts that an initial use of excessive force—Officer Deal grabbing and pushing Mr. Williams back into the car—was the proximate cause of Mr. Williams's death. Third, the plaintiff asserts that the shooting itself was objectively unreasonable.

---

[8] During its inquiry, the GBI found a glass pipe in the center console ashtray of Officer Deal's patrol car. Officer Deal could not explain its presence, but the vehicle was the day-shift vehicle—not his usual patrol car. Officer Deal offered to provide the GBI with hair, blood, and urine samples. The GBI collected a urine sample, which tested negative.

17

The plaintiff hasn't met her burden on any of these theories. Whatever arguments support the unlawful-arrest claim are no basis to affirm the district court's denial of qualified immunity on the distinct excessive-force claim. The act of grabbing Mr. Williams and trying to push him back into the car was not an unconstitutional use of excessive force. The ultimate use of deadly force was objectively reasonable under the Fourth Amendment because Officer Deal had probable cause to believe that Mr. Williams posed a threat of serious physical harm. The plaintiff has thus shown no violation of the Fourth Amendment.

1

The plaintiff's first theory is that Officer Deal violated Mr. Williams's Fourth Amendment rights by arresting him without probable cause and that this constitutional violation led to his death. The plaintiff points to *Jackson v. Sauls*, 206 F.3d 1156 (11th Cir. 2000), where we found the evidence "sufficient to create jury issues regarding whether Defendants' illegal stop proximately caused" a death. *Id*. at 1168. *Jackson* explained that "[f]or damages to be proximately caused by a constitutional tort, a plaintiff must show that, except for that constitutional tort, such injuries and damages would not have occurred and further that such injuries and damages were the reasonably foreseeable consequences of the tortious acts or omissions in issue." *Id*.

18

The district court found no genuine dispute of material fact as to the stop-sign violation. It concluded that Officer Deal didn't violate the Fourth Amendment by initiating the traffic stop. The district court granted Officer Deal's summary judgment motion on the unlawful-arrest claim and entered judgment on that claim. The plaintiff didn't cross-appeal that judgment.[9] But the plaintiff urges affirmance of the district court's order based on the theory that, as an allegedly unconstitutional stop, it might yet serve as the proximate cause of Mr. Williams's death.

It's true that "[a]n appellee who does not take a cross-appeal may 'urge in support of a decree any matter appearing before the record, although his argument may involve an attack upon the reasoning of the lower court.'" *Jennings v. Stephens*, 135 S. Ct. 793, 798 (2015) (quoting *United States v. Am. Railway Express Co.*, 265 U.S. 425, 435 (1924)). "But an appellee who does not cross-appeal may not 'attack the decree with a view either to enlarging his own rights thereunder or of lessening the rights of his adversary.'" *Id*.

The argument that summary judgment should not have been granted on the unlawful-arrest claim can't serve as an alternative basis for affirmance as to an excessive-force claim. In this circuit, there is a fork in the road based on the lawfulness of a seizure. If the seizure itself violates the Fourth Amendment, then the re-

---

[9] The district court's decision to enter judgment on that claim allowed the plaintiff to take a cross appeal at the same time as the defendant's interlocutory appeal of the denial of qualified immunity on the excessive-force claim.

coverable damages "include damages suffered because of the use of force in effecting" it and any excessive-force claim is subsumed in the unlawful-arrest claim. *Williamson v. Mills*, 65 F.3d 155, 158 (11th Cir. 1995). This is so "because if a stop or arrest is illegal, then there is no basis for any threat or any use of force, and an excessive force claim would always arise but only collaterally from the illegal stop or arrest claim." *Jackson*, 206 F.3d at 1171. But excessive force used during a *legal* stop gives rise to a discrete excessive-force claim. *Id.*

If the district court was wrong about the unlawful-arrest claim, that's no basis to affirm the denial of qualified immunity on a discrete excessive-force claim. It is simply not an argument "supporting the judgment under review." *See Jackson v. Humphrey*, 776 F.3d 1232, 1243 (11th Cir. 2015) (Hinkle, J., concurring). And affirming on that basis would effectively lessen the rights of the defendant under the final judgment entered but not appealed.

In any event, we see no reason to disagree with the district court's conclusion that the stop was supported by probable cause. The record shows that Officer Deal observed Mr. Williams run a stop sign. The plaintiff has produced no contrary evidence to show a genuine dispute of material fact. *See* Fed. R. Civ. P. 56(c).[10] Accordingly, we conclude that even if the unlawful-arrest claim could support affirmance of the district court's order, the plaintiff would still not have shown a vio-

---

[10] Because the seizure was supported by probable cause, we needn't decide whether Mr. Williams's death could be a reasonably foreseeable consequence of the stop.

20

lation of clearly established law.

2

The plaintiff concentrates her arguments on the second theory, which is that under *Jackson v. Sauls*, an initial use of unconstitutionally excessive force—Officer Deal grabbing and attempting to push Mr. Williams back into the car—was the proximate cause of Mr. Williams's death. The plaintiff points us to a line of cases from the Ninth Circuit generally holding that "where an officer intentionally or recklessly provokes a violent confrontation, if the provocation is an independent Fourth Amendment violation, he may be held liable for his otherwise defensive use of deadly force." *Billington v. Smith*, 292 F.3d 1177, 1189 (9th Cir. 2002).

The district court declined to rule on whether this initial contact was a separate constitutional violation, instead considering the incident as a whole.  ECF No. 190, at 24 n.22. But the plaintiff asserted as much below and on appeal. So we address it here. Even if we applied the Ninth Circuit's rule, the plaintiff's second theory fails because there was no *unconstitutional* provocation.

The use of excessive force in carrying out an arrest is a violation of the Fourth Amendment. *Graham v. Connor*, 490 U.S. 386, 394 (1989). The "objective reasonableness" standard applies in determining whether the use of force was excessive. *Penley v. Eslinger*, 605 F.3d 843, 849–50 (11th Cir. 2010). The force used by a police officer in carrying out an arrest must be reasonably proportionate to the

21

need for that force. *Lee v. Ferraro*, 284 F.3d 1188, 1198 (11th Cir. 2002). Although the extent of any injury may be relevant, the core judicial inquiry in a Fourth Amendment excessive-force case is the nature of the force. *See Saunders v. Duke*, 766 F.3d 1262, 1270 (11th Cir. 2014) (citing *Wilkins v. Gaddy*, 559 U.S. 34, 38–39 (2010)).

We usually don't "second-guess the decisions made by police officers in the field." *Vaughan v. Cox,* 343 F.3d 1323, 1331 (11th Cir. 2003). "The reasonableness of a particular use of force must be judged from the perspective of a reasonable of-ficer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 397 (quotation omitted). "The calculus of reasonableness must embody al-lowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id*. at 396–97. The relevant factors include "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* at 396. Apply-ing these factors, we conclude that this use of force was objectively reasonable; that is, reasonably proportionate under the circumstances and not excessive.

The first factor moves the needle towards Officer Deal only a little, and only because "the right to make an arrest or investigatory stop necessarily carries with it

22

the right to use *some* degree of physical coercion or threat thereof to effect it." *Graham*, 490 U.S. at 396 (emphasis added). The offense originally justifying a seizure—running a stop sign—is a misdemeanor under state law.  *See* Ga. Code Ann. §40-6-20(a). This justified an arrest. *See Atwater v. City of Lago Vista*, 532 U.S. 318, 354 (2001). The government has "a significant interest in enforcing the law on its own terms, rather than on terms set by the arrestee." *Buckley v. Haddock*, 292 F. App'x 791, 794 (11th Cir. 2008). This is so "regardless of the severity of the alleged offense." *Durruthy v. Pastor*, 351 F.3d 1080, 1094 (11th Cir. 2003) (holding that throwing an arrestee to the ground and placing handcuffs was not excessive for the crime of illegally standing in intersection). We've rejected before—and we reject again—the implicit suggestion that the "force applied by [a police officer effecting an arrest] was illegally disproportionate because no force was acceptable" in these circumstances. *See id*. And, even where the offense is minor, "a prudent officer must consider the possibility of a violent response from the subject."  *See Singletary v. Vargas*, 804 F.3d 1147, 1181 n.10 (11th Cir. 2015). This is especially true given the facts about Mr. Williams as they appeared to this officer.

That's why the second factor—whether the suspect poses an immediate threat to the safety of the officers or others—also weighs in favor of Officer Deal. Here Officer Deal had reason to believe—based on prior dealings with Mr. Williams and information received from other police officers—that Mr. Williams

23

might be dangerous. For example, we noted before that Mr. Williams told a mutual friend that the next time another EDPD officer pulled him over or came to his house "it would be the last time," or words to that effect. Likewise, Officer Deal had been told that Mr. Williams was suspected of stealing guns. That sort of information bears on whether Mr. Williams posed an immediate threat to the police officer's safety and on the reasonableness of the attempt to push Mr. Williams back into the car. *See, e.g.*, *MacMillan v. Roddenberry*, 432 F. App'x 890, 896–97 (11th Cir. 2011). To be sure, there is no evidence that Mr. Williams brandished a weapon. But the force used is more likely justified if the officer has reason to think that the person to be seized might be armed.

The third factor—whether the individual is actively resisting arrest or attempting to evade arrest by flight—also weighs in favor of Officer Deal. Perhaps Mr. Williams wasn't trying to elude Officer Deal. But the necessarily fact-specific inquiry takes into account facts as they reasonably appeared to the police officer. If an officer reasonably, but mistakenly, believes that one of the factors relevant to the merits of the constitutional excessive-force claim is present, the officer is justified in using more force than in fact was needed. *See Saucier,* 533 U.S. at 205. Here, Officer Deal had reason to believe that Mr. Williams was attempting to elude him after the traffic stop—speeding away from the scene and taking a circuitous route using side streets to reach an ultimate destination. It was also reasonable to con-

24

clude that Mr. Williams got out of the car quickly to flee. And while there was only a brief moment between the verbal command and the initial contact, during that period Mr. Williams kept coming towards Officer Deal.

The plaintiff asserts that Mr. Williams didn't have a reasonable amount of time to comply with Officer Deal's order to get back in the car, and this makes the force used objectively unreasonable. The plaintiff relies on the "general principle that if officers use deadly force because of fear created by their own unprovoked physical violence against a non-hostile citizen, those officers may be liable under the Fourth  Amendment." Answer Brief, at 56. The plaintiff cites three of our cases in support of this proposition, but each has an important difference.

The first case the plaintiff relies on is *Gilmere v. City of Atlanta*, 774 F.2d 1495 (11th Cir. 1985) (en banc). There the police received a report that after a near traffic accident, a drunk driver threatened the other driver with a gun.  *Id*. at 1496–97. The police went to the drunk driver's home, escorted him outside by force, and began beating him about the head. *Id*. at 1497. The man wrestled free and a police officer shot and killed him. *Id*. Following a bench trial, the district court found that the beating occurred with little or no provocation and that the blows were not delivered in a good faith effort to control the man, but rather out of irritation at his initial resistance. *Id*. at 1501. It also found that the officer's belief that his life was in danger was not objectively reasonable and could not justify the killing. *Id*. On

25

appeal, we concluded that the beating was unwarranted and "the unwarranted shooting which directly resulted from his efforts to escape the officer's further physical abuse" gave grounds for relief under the Fourth Amendment. *Id.* at 1502.

The second case the plaintiff relies upon is *Mercado v. City of Orlando*, 407 F.3d 1152 (11th Cir. 2005). There the plaintiff was threatening suicide with a knife and the police responded. *Id.* at 1154. The police ordered the plaintiff to drop the knife. *Id.* The plaintiff had made no threatening moves or statements towards the officers or anyone else. *Id.* Thirty seconds or so later—and without giving a warning—a police officer used *deadly* force. *Id.* at 1155. We noted that the plaintiff "[a]rguably . . . did not have time to obey [the police officer's] order." *Id.* at 1157. We reasoned that all of the *Graham* factors weighed in favor of the plaintiff, who had not committed a crime, resisted arrest, or posed a threat to the police officers. *Id.*

The third case is *Fils v. City of Aventura*, 647 F.3d 1272 (11th Cir. 2011). There a police officer overheard the plaintiff clubgoer criticize the police in profane terms for arresting another clubgoer. *Id.* at 1288. The police officer confronted the plaintiff and drew a taser. *Id.* The plaintiff took one step back and raised his hands.  The police officer shot the plaintiff with the taser. *Id.* When the plaintiff did not fall to the ground, a second police officer shot the plaintiff with a taser. *Id.* And when the plaintiff finally went to the ground, the second police officer put his knee

in the plaintiff's back and grinded his contact taser into the plaintiff's neck. *Id*. We reasoned that previous cases such as *Vinyard v. Wilson*, 311 F.3d 1340 (11th Cir. 2002), "establish that unprovoked force against a non-hostile and non-violent suspect who has not disobeyed instructions violates that suspect's rights under the Fourth Amendment." *Fils*, 647 F.3d at 1289. The plaintiff wasn't violent, didn't disobey an order, and didn't resist arrest.  *Id*. at 1290.

None of those three cases leads to the conclusion that Officer Deal's initial use of force was excessive. In *Gilmere*, the police repeatedly struck the man on the head not to effect an arrest, but out of irritation. In *Mercado*, the police officer used unnecessary deadly force. And in *Fils*, our conclusion was based on the proposition that "non-violent suspects, accused of minor crimes, who have not resisted arrest . . . are victims of constitutional abuse when police use[] *extreme* force to subdue them." 647 F.3d at 1289 (emphasis added). In contrast to this case, each of those cases involved excessive force—that is, unreasonably disproportionate force—under the circumstances.

The standard of reasonableness at the moment applies: "Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers . . . violates the Fourth Amendment." *Graham*, 490 U.S. at 396 (internal quotation and citation omitted). Following *Graham*, this Court continued to apply the principle "that the application of de minimis force, without more, will not support a claim

27

for excessive force in violation of the Fourth Amendment." *Nolin v. Isbell*, 207 F.3d 1253, 1257 (2000).[11]

A review of the cases applying the de minimis force principle shows why the force used here—though likely and understandably unsettling to a motorist—was not excessive. Compare, for example, *Vinyard v. Wilson.* There the plaintiff had a cookout at her boyfriend's house. 311 F.3d at 1343. A police officer received a complaint and told the plaintiff not to give alcohol to a neighbor's son. *Id*. After the police officer left, the plaintiff exchanged words with the neighbor. *Id*. The police officer returned and told the plaintiff to get up out of her chair. *Id*. "Before she could rise, however, he grabbed her arm and jerked her out of her chair." *Id*. The police officer took the plaintiff to jail. *Id*. When they arrived at the jail, the police officer dragged the plaintiff inside "either by her shirt, her arm or her hair." *Id*. at 1344. This Court concluded that the "force used and any injury sustained at those two points were de minimis and not excessive." *Id*. at 1349 n.13.[12] The cases

---

[11] This is a shortened form of the legal maxim *de minimis non curat lex*, or "the law does not concern itself with trifles." Bryan A. Garner, *Garner's Dictionary of Legal Usage* 263 (3d ed. 2011). Of course the de minimis force principle "has never been used to immunize officers who use excessive and gratuitous force after a suspect has been subdued, is not resisting, and poses no threat." *Saunders*, 766 F.3d at 1269.

[12] During the ride to the jail, the police officer and the plaintiff had traded insults. *Id*. The police officer stopped the car and opened the back door. *Id*. at 1343. The plaintiff ducked away. *Id*. The police officer grabbed the plaintiff's arm and breast. *Id*. The police officer then sprayed the plaintiff's face with pepper spray. *Id*. This Court said that "[a] strong argument exists that even [the police officer's] grabbing of [the plaintiff] and the minor bruising during the jail ride constitute de minimis force and injury" but "[w]hat distinguishes [the police officer's] force during the jail ride from the de minimis force and injury cases is the use of pepper spray." *Id*. n.13.

28

*Vinyard* relied on for that conclusion each involved more force with less justification than Officer Deal's act of grabbing Mr. Williams and trying to push him back into the car during this lawful stop.[13]

We've also considered whether the evidence would allow a reasonable jury to find that Officer Deal used greater force than what we have described, say smashing Mr. Williams's head into the car. In the absence of any other evidence of such force, we don't think that Mr. Williams's statements ("What is wrong with you?") during the fight permit such an inference.

Accordingly, we conclude that the initial use of force—Officer Deal grabbing and attempting to push Mr. Williams back into the car—was not excessive under the circumstances. Perhaps this wasn't the wisest course of action. Maybe it was a bad idea. But "[w]e do not sit in judgment to determine whether an officer made the best or a good or even a bad decision in the manner of carrying out an ar-

---

[13] *See Vinyard*, 311 F.3d at 1349 n.13 (describing "decisions where force and injury were held to be de minimis and not excessive"); *Nolin v. Isbell*, 207 F.3d 1253, 1255 (11th Cir. 2000) (grabbing plaintiff and shoving him a few feet against vehicle, pushing knee in back and head against van, and handcuffing him); *Gold v. City of Miami*, 121 F.3d 1442, 1444 (11th Cir. 1997) (handcuffing too tightly and too long); *Jones v. City of Dothan*, 121 F.3d 1456, 1458 (11th Cir. 1997) (slamming plaintiff against the wall, kicking his legs apart, and requiring plaintiff to raise hands above head as officers carried out arrest); *Post v. City of Fort Lauderdale*, 7 F.3d 1552, 1556 (11th Cir. 1993) (pushing plaintiff against wall while handcuffed), *modified*, 14 F.3d 583 (11th Cir.1994).

29

rest." *Buckley*, 292 F. App'x at 794.[14] Even under the cases the plaintiff relies on from a sister circuit, action that *complies* with the Fourth Amendment "is not rendered unreasonable because it provokes a violent reaction." *City & Cnty. of San Francisco v. Sheehan*, 135 S. Ct. 1765, 1777 & n.4 (2015) (discussing those cases but declining to endorse or reject them). [15]

3

The plaintiff's final theory is that the shooting itself was an unconstitutional use of excessive force given the totality of circumstances. The Supreme Court's decision in *Tennessee v. Garner*, 471 U.S. 1 (1985), guides the Fourth Amendment reasonableness analysis where a police officer uses deadly force. *See Penley*, 605 F.3d at 850. Under *Garner*, the use of deadly force is "more likely reasonable if: the suspect poses an immediate threat of serious physical harm to officers or others; the suspect committed a crime involving the infliction or threatened infliction

---

[14] We've considered the reports of experts submitted by the plaintiff criticizing Officer Deal's conduct. But "so long as a reasonable officer could have believed that his conduct was justified, a plaintiff cannot avoi[d] summary judgment by simply producing an expert's report that an officer's conduct leading up to a deadly confrontation was imprudent, inappropriate, or even reckless." *City & Cnty. of San Francisco v. Sheehan*, 135 S. Ct. 1765, 1777 (2015) (quotation omitted); *see also id.* (citing *Saucier*, 533 U.S. 194, 216, n.6 (Ginsburg, J., concurring in judgment) ("[I]n close cases, a jury does not automatically get to second-guess these life and death decisions, even though a plaintiff has an expert and a plausible claim that the situation could better have been handled differently." (quotation omitted))).

[15] Because the initial force wasn't excessive, we needn't decide whether Mr. Williams's death could be a reasonably foreseeable consequence. *See generally Kane v. Lewis*, 604 F. App'x 229, 235 (4th Cir. 2015), *cert. denied,* 136 S. Ct. 358 (2015) (discussing constitutional violations, proximate cause, and superseding cause).

of serious harm, such that his being at large represents an inherent risk to the general public; and the officers either issued a warning or could not feasibly have done so before using deadly force." *Penley*, 605 F.3d at 850. "[O]nce we have determined the relevant set of facts and drawn all inferences in favor of the nonmoving party to the extent supportable by the record" the reasonableness of a use of deadly force "is a pure question of law." *Scott v. Harris*, 550 U.S. 372, 381 n.8 (2007).[16]

The district court found that genuine issues of material fact existed as to the first and third of those factors. We disagree.

In two respects, we part company with the district court's analysis of the third factor—the feasibility of issuing a warning. First, the order says "whether it was feasible for Deal to have issued a warning prior to firing is also an integral one of fact for jury determination." That's not so. As part of the reasonableness inquiry, a determination whether it was feasible to issue a warning is a legal conclusion drawn from facts. *See Scott*, 550 U.S. at 382; *e.g.*, *Penley*, 605 F.3d at 854 & n.6. Here there's no genuine dispute of material fact about what happened, only the legal significance of what happened.

---

[16] We recognize that there is a difference of opinion about this. *See Scott*, 550 U.S. at 390 (Stevens, J., dissenting) (reasoning that "[d]epending on the circumstances . . . the question of the reasonableness of the officer's actions should be decided by a jury"); *see also* Dan M. Kahan, David A. Hoffman, and Donald Braman, *Whose Eyes Are You Going to Believe*? Scott v. Harris *and the Perils of Cognitive Illiberalism*, 122 Harv. L. Rev. 837, 843 (2009). But the opinion that matters is the Supreme Court's opinion. Recognizing that there's room to judge underlying facts differently, we have tried to confront any "unconscious priors" in deciding this case. *See* Richard A. Posner, *Divergent Paths: The Academy and the Judiciary* 17 (2016).

Second, the order overemphasizes the significance of a verbal warning. "[A] mechanical application of these factors . . . is not appropriate." *Penley*, 605 F.3d at 850. *Garner* isn't "a magical on/off switch that triggers rigid preconditions whenever an officer's actions constitute deadly force." *Id*. (quoting *Scott*, 550 U.S. at 382). "[N]one of these conditions are prerequisites to the lawful application of deadly force by an officer seizing a suspect." *Id*. We have "decline[d] . . . to fashion an inflexible rule that, in order to avoid civil liability, an officer must always warn his suspect before firing—particularly where . . . such a warning might easily have cost the officer his life." *Id*. at 854 n.6 (alteration in original and quotation omitted). And Officer Deal drawing and aiming his gun plainly served as a nonverbal warning against approaching the officer; a warning that Mr. Williams disregarded.

The first factor weighs heavily in Officer Deal's favor. It can often be reduced to a single question: "[W]hether, given the circumstances, [the suspect] would have appeared to reasonable police officers to have been gravely dangerous." *Pace v. Capobianco*, 283 F.3d 1275, 1281 (11th Cir. 2002). It is "constitutionally permissible . . . for an officer to use deadly force when he has 'probable cause to believe that his own life is in peril.'" *Singletary*, 804 F.3d at 1181 (quoting *Robinson v. Arrugueta*, 415 F.3d 1252, 1256 (11th Cir. 2005)).

As to the first factor, the district court said "the ultimate question of whether Deal reasonably feared for his safety is a question of fact when so much of the incident does not appear on camera." ECF No. 190, at 26. While we agree that sometimes video evidence can conclusively establish certain facts, *see Scott*, 550 U.S. at 380, that doesn't make other evidence incapable of establishing facts for purposes of summary judgment.

The undisputed facts are that Mr. Williams threw and landed multiple punches aimed at Officer Deal's head. As the district court recounted, Mr. Williams "grabbed Deal's firearm holster and made several violent jerking motions. Deal struggled to hold on to the gun, and the holster unsnapped." ECF No. 190, at 9 (citation omitted). After Officer Deal had separated from Mr. Williams and drawn and aimed his gun, Mr. Williams advanced towards Officer Deal. The distance between them was no greater than ten feet when Mr. Williams advanced towards Officer Deal, and the shot came less than two seconds after they separated. We conclude that under those circumstances Officer Deal had probable cause to fear for his life.

The fact that Mr. Williams was unarmed at the time of the gunshot doesn't change this result. Mr. Williams was actively and violently resisting a lawful seizure. There had been a struggle at close quarters. Punches had been thrown and landed. Even if Mr. Williams didn't succeed in partly removing the gun from the holster, a reasonable officer would have perceived that Mr. Williams was attempt-

33

ing to gain control of the gun when he kept advancing. "Under the circumstances a reasonable officer would perceive a substantial risk that [Mr. Williams] would seriously injure or kill him, either by beating . . . him, or by taking his gun and shooting him with it." *See Billington*, 292 F.3d at 1185; *see also DeLuna v. City of Rockford*, 447 F.3d 1008, 1013 (7th Cir. 2006) (an officer "need not wait until there is a physical struggle for control of his weapon before a situation presents an imminent danger of serious physical injury"); *Blossom v. Yarbrough*, 429 F.3d 963, 968 (10th Cir. 2005) (holding that deadly force was lawful because the suspect was advancing on the officer in what appeared to be an effort to get his weapon). In these circumstances, a police officer needn't risk his life on the chance that the advancing suspect has or will suddenly develop peaceful intentions. *See Scott*, 550 U.S. at 385.

We conclude that this use of deadly force was objectively reasonable under all of the circumstances.

4

In keeping with the standard of review, we have reviewed the record looking for some evidence which contradicts the police officer's account of the incident in a way that makes a difference. We've found none.

34

The plaintiff hasn't shown that Officer Deal violated the Fourth Amendment. Accordingly, he is entitled to judgment from the plaintiff's Fourth Amendment excessive-force claim.

### III

The district court denied Officer Deal's claim of official immunity on the state-law claims, concluding that "Deal was no longer a 'government official' under state law." On appeal, Officer Deal relies on *Taylor v. Waldo*, 709 S.E. 2d 278 (Ga. Ct. App. 2011), which is consistent with our view of the scope-of-authority requirement. *Id.* at 281 (citing Restatement §895D cmt. g). He asserts that he's demonstrated an entitlement to official immunity from the plaintiff's state-law claims because he performed discretionary acts without actual malice. *See Valades v. Uslu*, 689 S.E. 2d 338, 343 (Ga. Ct. App. 2009). The plaintiff made no contrary arguments. So they are waived. *See, e.g.*, *La Grasta v. First Union Sec., Inc.*, 358 F.3d 840, 847 n.4 (11th Cir. 2004).

*** 

The district court order denying summary judgment to Jeffrey Deal is reversed. The case is remanded with instructions to enter judgment in favor of Officer Deal on all claims on the basis of this opinion.